**SO ORDERED.**

**SIGNED this 15 day of March, 2013.**



_____
**James D. Walker, Jr.
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 11-11270-JDW |
| RONALD A. GOODWIN, JR., | ) | |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| AB&T NATIONAL BANK, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 11-1049 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| RONALD A. GOODWIN, JR., | ) | |
| | ) | |
| DEFENDANT. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

COUNSEL

For Plaintiff:   Timothy O. Davis
                Post Office Box 607
                Albany, Georgia 31702

For Debtor:   F. Anthony Blakey
                Post Office Box 70879
                Albany, Georgia 31708

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiff's complaint objecting to discharge. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(J). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

Debtor Ronald Goodwin, Jr. trained as a heating and cooling technician. In approximately 2000, he decided to open his own heating and cooling business, Southland Technologies, Inc. ("Technologies"), based in Sylvester, Georgia. At that time, he and his wife Kimberly Goodwin decided to keep their residence in Kimberly's name.

When Debtor started Technologies, he brought in six investors, who each owned 7% of the stock in the company. Technologies borrowed money from AB&T Bank, which secured the loan by a lien in all of Technologies' assets, including accounts receivable and inventory. Debtor personally guaranteed the loan. AB&T stipulated that its loan agreement with Technologies did not include a lockbox arrangement, a sweep account, or other provision that required Technologies to turn over all accounts receivable or otherwise pay down its line of credit before taking new advances.

The business immediately began doing well, and Debtor opened four additional offices in different parts of Georgia: Columbus, Warner Robins, Sea Island, and Atlanta. However, with operations so dispersed, Debtor struggled to keep up with record keeping and could not afford the services of a full-time accountant. To relieve himself of some of the managerial burden and to

give his investors an opportunity for greater ownership, Debtor decided to convert the area offices into franchises. Debtor created a new company, Southland Enterprises ("Enterprises"), intended to operate as a parent company, while Technologies remained Debtor's piece of the business. Although Debtor formed Enterprises and booked contracts for Enterprises, the franchise concept never materialized. Instead, some of the original investors gave up their stock in Technologies and began their own separate businesses. At that time, Technologies and Enterprises were operating simultaneously.

By 2008, the last remaining investors withdrew from Technologies, leaving Debtor as the sole owner of both Technologies and Enterprises. Nevertheless, Debtor faced ongoing disputes with some of the prior owners of Technologies over money. To wrap up the loose ends, Debtor decided to close Technologies and Enterprises and open a new company called Southland Controls ("Controls"). Debtor testified he intended Controls to take over the assets and the debts of Technologies and Enterprises.

In December 2010, Debtor and Carey Barfield–a certified public accountant who provided some accounting and payroll services to Debtors' companies–met with Phil Franklin, a loan officer at AB&T. The three men discussed Debtor's plans. According to Debtor, Mr. Franklin agreed to prepare the paperwork to open bank accounts for Controls and to move Technologies' debt to Controls. Mr. Franklin also instructed Debtor to stop putting money into Technologies and Enterprises, and to start consolidating operations in Controls. Debtor testified that Mr. Franklin prepared paperwork to transfer the debt. However, for unexplained reasons, Debtor never signed the paperwork, although Controls did open two checking accounts at AB&T.

4

Controls began booking contracts soon after it was formed, but did not actually begin performing work on the contracts until March or April of 2011. Debtor never moved any real estate, rolling stock, or vehicles from Technologies or Enterprises to Controls.[1] He did however, transfer money among the companies. Debtor testified he only did so to ensure that payments from a job were received by the company that actually performed the work.

Of particular relevance to AB&T's complaint are various transactions to and from the companies between January 2011 and July 2011. During that time, Enterprises wrote checks to Mr. Barfield in the total amount of $245,477.29. Both Debtor and Mr. Barfield testified Mr. Barfield had been writing checks to pay Enterprises' subcontractors from his business account. According to Mr. Barfield, this arrangement was for his convenience, and he did not charge a fee or interest for advancing the funds. The payments to Mr. Barfield from Enterprises consisted of reimbursements for the subcontractor payments. Debtor also occasionally made payments to Mr. Barfield to reduce a debt of approximately $110,000, which consisted of a $77,000 loan made by Mr. Barfield[2] and back pay for Mr. Barfield's accounting services.

In addition to the Barfield transactions, AB&T relies on transfers to Enterprises and Controls that originated with Technologies.[3] Glen Creech, a credit officer and senior vice president of AB&T, testified that Technologies had, during the period from January 2011 to July

---

[1] Technologies' real estate and rolling stock were eventually surrendered to AB&T.

[2] In 2005 or 2006, one of Debtor's investors purchased $170,000 worth of materials on credit for Technologies. Debtor was unaware of the purchase until he received a letter from a collection agency demanding payment of $77,000. Mr. Barfield loaned Debtor the funds to pay the debt.

[3] While AB&T held a security interest in all Technologies' assets, it never retained a security interest in any assets of Enterprises or Controls.

2011, transferred hundreds of thousands of dollars to Enterprises.[4] However, Mr. Creech's testimony about the total amount of the transfers was inconsistent. On direct examination, Mr. Creech testified that Enterprises deposited $1,186,790 into its bank account at SB&T Bank[5] between January 2011 and July 2011. Of that amount, $604,000 represented funds paid by either Technologies or Controls, and $565,108 represented funds collected on Enterprises' accounts receivable. On re-direct examination, Mr. Creech testified that $1,186,790 of the funds came from Technologies. In addition, Mr. Creech testified that Controls received $15,000 from Enterprises during that period, although he did not provide an exact date. Mr. Creech further testified that Controls' account at Southwest Georgia Bank showed deposits of $121,982. However, he did not state when those deposits were made or where they originated. Finally, Mr. Creech testified that Enterprises wrote four checks to Controls: a check dated June 10, 2011, in the amount of $5,000; a check dated June 10, 2011, in the amount of $1,000; a check dated July 11, 2011, in the amount of $9,000; and a check dated July 13, 2011, in the amount of $9,000.

Debtor explained that during the January 2011 to July 2011 period all three companies were performing jobs under separate contracts. The companies sometimes borrowed materials and labor from each other. Any transfer of funds among the companies represented payments for the use of those materials and labor, which was part of the companies' normal course of business. Debtor testified that the four checks and other transfers cited by AB&T were payments for assets

---

[4] Mr. Creech testified to summaries of information derived from the three companies' bank records.

[5] SB&T and AB&T are unrelated entities.

of the payee used by the payor. However, he admitted he could not identify the specific assets at issue for each transaction. AB&T offered no evidence to refute Debtor's testimony.

In support of its case, AB&T also points to Debtor's failure to submit certain financial information to the bank in early 2011. Under their agreement, Debtor was required to provide AB&T with monthly receivables and inventory reports. The bank received a March 31, 2011, report, showing receivables of $680,079.66 and inventory of $201,649. Debtor failed to submit reports for April and May 2011. The June 30, 2011, report showed receivables of $443,894.48 and inventory of $95,323. Mr. Creech testified the reports had never before shown a decrease of that size.

Debtor testified that the changes in the accounts were due to two large jobs booked by Technologies in 2011: one at Phoebe Sumter Medical Center that started in January 2011 and one at Fort Stewart that started in April 2011. The time frame for performing the jobs unexpectedly overlapped and required Technologies to commit all its available receivables to completing them. In April, the Medical Center requested change orders, which Technologies could not afford to fulfill. Therefore, Technologies obtained $100,000 on a short-term note from AB&T. Technologies used the money to finish the job and submitted invoices to the Medical Center. The Medical Center failed to pay Technologies promptly. Thus, in May, Debtor requested a 30-day extension on the note, which AB&T granted. After further payment delays by the Medical Center, Debtor requested a second extension, which AB&T denied.

In July 2011, AB&T initiated two meetings with Debtor to discuss the short-term note. At a meeting held on July 25, Mr. Creech asked Debtor if he still owned a one-half interest in his residence. According to Debtor, he was unaware of any ownership interest in the house at that

7

time. After Mr. Creech told Debtor he was on the title, Debtor alerted his wife Kimberly about the situation. She in turn contacted her mortgage company. The mortgage company confirmed Debtor's name was on the deed. Debtor and Kimberly testified that because they had always intended Kimberly to own the house, Debtor signed a quitclaim deed in Kimberly's favor, which Kimberly recorded on July 18, 2011.

Kimberly testified that she provided the down payment for construction of the house, that she is the only person liable on the mortgage, and that she makes the mortgage payments out of her earnings and some of her savings. Kimberly works as a radiation therapist. In 2012 her gross earnings were approximately $80,000; at the time of Debtor's bankruptcy filing, her gross earnings were approximately $73,000. The monthly mortgage payment on the residence is approximately $2,750. Although AB&T does not hold the mortgage on the house, it did finance construction of the house. Kimberly could not recall whether Debtor was on the construction loan. Debtor testified that the house was only about 1 ½ years old at the time of transfer and had little, if any, equity.

Debtor admitted the July 25 meeting with Mr. Creech put him on notice that AB&T was taking an interest in his residence. But, he testified the decision to put the house solely in Kimberly's name was made 11 years earlier, when he decided to start a business, based on advice from Kimberly's mother. Kimberly's father had owned an electrical business. When he developed cancer and died, the company failed and the family lost everything, except the house, which had been kept separate from the business.

In a pretrial deposition held on September 7, 2011, Debtor testified as follows:

> **Q:** Well, once you found out you had a one-half interest in the

>   house, why did you, one month before your bankruptcy, deed it to
>   your wife?
>   **A:** Because I did not know that I was not supposed to do that. I
>   didn't want this house tied up in the bankruptcy.
>   **Q:** OK. You wanted your house to remain free and clear and not be
>   involved in your personal bankruptcy?
>   **A:** My personal bankruptcy. That's correct.

During the trial, Debtor testified that he "misanswered" the deposition question. At the time of the transfer of his interest in the house, Debtor was not contemplating bankruptcy. He did not realize his business was in trouble until two weeks later, when AB&T sent a demand letter to Debtor's customers. Debtor further explained that when he started Technologies 11 years earlier, it had been his intention to keep the house separate from the business in the event the business failed or he had to file bankruptcy sometime in the future.

A second meeting between Debtor and representatives of AB&T was held on July 29, 2011. On cross-examination, Debtor agreed that during the meeting AB&T offered to make a 90-day loan to cover the $100,000 short-term note plus $239,895 for operating expenses in exchange for information enabling it to collect Technologies' receivables. Mr. Creech testified that during this meeting, he advised Debtor that AB&T planned to send a letter to Debtor's customers demanding that receiveables be paid to AB&T. According to Debtor, the loan fell through even though he was willing to give the bank the information it requested, because Debtor objected to the bank's plan to send a demand letter to his customers.

On August 9, 2011, Debtor received notice that AB&T had called all its notes due and had sent demand letters to collect on Technologies' accounts receivables. On August 18, 2011,

9

Debtor filed a Chapter 7 petition.[6] Schedule A showed Debtor as a co-owner of the residence and noted that the mortgage was solely in his wife's name. He valued the property at $385,000, subject to a secured debt in the amount of $370,000. His Schedule B showed his ownership of Technologies and Enterprises, but not Controls. He did not list the transfer of his interest in the residence on the Statement of Financial Affairs ("SOFA"). On October 20, 2011, Debtor amended his Schedule B and SOFA to correct the omissions.[7]

AB&T filed a complaint objecting to discharge under 11 U.S.C. § 727(a)(2)(A) alleging Debtor fraudulently transferred his interest in the residence and under § 727(a)(5) alleging Debtor converted or transferred Technologies' accounts receivables to avoid payment to the bank. The Court held a trial on January 10, 2013. Having considered the evidence and legal arguments, the Court will enter judgment for AB&T.

## Conclusions of Law

AB&T seeks to deny Debtor a discharge under 11 U.S.C. § 727(a). Because bankruptcy policy favors providing a fresh start to honest but unfortunate debtors, objections to discharge are construed liberally in favor of the debtor. Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). The party opposing discharge must prove its case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991); Jennings v. Maxfield

---

[6] Technologies and Enterprises are no longer in business. However, Controls still operates and has not filed bankruptcy.

[7] During the trial, Debtor's counsel stated the amendments were filed prior to the meeting of creditors. However, the docket indicates the meeting of creditors was held on October 14, 2011–six days before Debtor amended his schedules and SOFA.

(In re Jennings), 533 F.3d 1333, 1339 (11th Cir. 2008). If it does so, the burden shifts to the debtor to "'bring forward enough credible evidence to dissuade the court'" from denying discharge. Id. (quoting In re Prevatt, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000)).

Transfer of Debtor's One-Half Interest in the Residence

Under 11 U.S.C. § 727(a)(2)(A), the "court shall grant the debtor a discharge, unless ... the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred ... property of the debtor, within one year before the date of the filing of the petition[.]" Thus, AB&T must prove four elements: (1) a transfer; (2) of the debtor's property; (3) within one year before the petition date; (4) done with intent to hinder, delay, or defraud a creditor. In this case, Debtor transferred to his wife his half interest in the marital residence approximately one month prior to the petition date. Therefore, if Debtor made the transfer with fraudulent intent, he is not entitled to a discharge.

In Miller, the Eleventh Circuit stated, "A creditor alleging intent to defraud under § 727(a)(2)(A) bears the considerable burden of demonstrating *actual fraudulent intent*; constructive fraud is insufficient." 39 F.3d at 306 (emphasis in original). Because debtors are unlikely to admit to fraudulent intent, it "may be established by circumstantial evidence or inferred from the debtor's course of conduct." Jennings, 533 F.3d at 1339 (citing In re Krehl, 86 F.3d 737, 743 (7th Cir. 1996)). Courts commonly rely on badges of fraud when making such an inquiry, including:

> (1) the lack or inadequacy of consideration for the property received;
> (2) the nature of the relationship between the transferor and the transferee;
> (3) whether the transferor retains possession, control, benefits, or

    use of the property in question;
    (4) whether the transfer resulted in insolvency;
    (5) the cumulative effect of the debtor's transactions and course of
    conduct after the onset of financial difficulties or threat of suit by
    creditors; and
    (6) the general chronology and timing of the transfer in question.

Id. (citing In re Marrama, 445 F.3d 518, 522 (1st Cir. 2006)).

  The evidence adduced at trial was sufficient to establish at least four of the badges of fraud: badge 1–Debtor transferred his interest in the property for no consideration; badge 2–Debtor transferred the property to his wife; badge 3–Debtor retained use of the property as his residence; and badge 6–Debtor made the transfer immediately after being questioned about his interest in the property by AB&T at a time that Debtor was attempting to obtain an extension from AB&T for a short-term note. Furthermore, in a pretrial deposition, Debtor testified that he made the transfer because he "didn't want this house tied up in the bankruptcy." Assuming these facts are sufficient for the Court to infer fraudulent intent, the burden shifts to Debtor to credibly explain otherwise.

  Debtor testified that the transfer was made to effectuate an understanding between him and his wife that had been in effect for at least 11 years–about a decade before building the house at issue. In addition, Debtor credibly testified about the origins of the agreement: When Debtor decided to start his own business, his decision to protect the marital residence was informed by the prior experience of Kimberly's family, who faced financial ruin after her father's death and the resulting collapse of her father's electrical business. Debtor also explained that his deposition testimony indicating a desire to protect the house from the present bankruptcy proceedings was mistaken. Debtor and his wife had always intended to protect the house against any possible

future business failure or bankruptcy. However, at the time he made the transfer, Debtor was not yet contemplating bankruptcy. Instead, he was in the process of consolidating his businesses into one company, and was working two large jobs that had resulted in what he believed to be a temporary interruption in cash flow, which would be resolved upon receiving payment for his invoices.

Debtor further pointed out that he fully disclosed his ownership interest in the house and its transfer. Although the transfer was not fully disclosed in his initial filings, he amended his SOFA shortly after the § 341 meeting of creditors. Furthermore, at the time of the transfer, the house was fully encumbered, leaving little if any equity available to unsecured creditors.

AB&T argues this case is controlled by the Eleventh Circuit's decision in Davis v. Davis (In re Davis), 911 F.2d 560 (11th Cir. 1990). In Davis, the debtor and a partner borrowed money to open a business. The business failed. Two days after the loan matured, the debtor consulted an attorney because he feared losing his home. The attorney advised the debtor to transfer his interest in the marital residence to his wife. The debtor did so. His business partner paid off the business loan and obtained a judgment against the debtor for contribution. The partner then initiated a fraudulent conveyance suit against the debtor alleging fraudulent transfer of the debtor's interest in the house. The debtor consulted a bankruptcy attorney, who advised him to reverse the transfer of the residence. The debtor did so, then filed a Chapter 7 petition the following day. His schedules fully disclosed the transfers. Id. at 560-61.

The debtor argued he was entitled to a discharge for two reasons: First, the house was fully encumbered by a mortgage so its transfer did not reduce assets available to creditors. Id. at 561. Second, the initial transfer to his wife was not fraudulent because the transfer was reversed

13

prior to the bankruptcy filing. Id. at 562. The circuit court rejected both arguments.

In addressing the debtor's first argument regarding equity, the circuit court found that the transfer was made with the requisite fraudulent intent. Id. at 562. "When [debtor] transferred his interest in the residence to his wife, he obviously intended to shield what he thought was valuable property from the claims of creditors." Id. Lack of equity in the property in no way mitigated against the fraudulent intent. Thus, it could not serve as a defense to the objection to discharge. "To hold now that there occurred no transfer of property with the intent to hinder creditors merely because the debts on the residence exceeded its estimated fair market value would be to reward [debtor] for his wrongdoing, which the court refuses to do." Id.

The court then considered the effect of the reverse transfer. The debtor argued that granting a discharge to a debtor who reverses an otherwise fraudulent transfer will encourage debtors to attempt to recover the property and disclose the details of the transfer, which ultimately benefits creditors. Id. The court rejected this policy argument in favor of a plain reading of the statute, noting, "Congress certainly was capable of drafting a statute which would deny a discharge only when assets were fraudulently transferred and remained transferred at the time of filing of bankruptcy proceedings, but it did not." Id. Thus, the reverse transfer did not insulate the debtor from denial of discharge. Id.

Under Davis, reversal of an otherwise fraudulent transfer combined with lack of equity in the transferred property are not sufficient to overcome a finding of fraudulent intent. In this case, the facts differ somewhat from those in Davis. In Davis, the debtor sought out legal advice for the purpose of protecting his house against a pending default on a business loan. The reversal of the transfer and the lack of equity were his only defenses against a finding of fraudulent intent.

14

Here, Debtor has testified that the presence of his name on the deed to his residence was an error because he and his wife never intended him to have any ownership interest in the house. Furthermore, the evidence indicates Debtor did not realize his business was in any financial trouble at the time of the transfer other than suffering an apparent temporary interruption in cash flow.

Although the Court finds Debtor's testimony credible, it is not sufficient to distinguish this case from the holding in Davis. Debtor's testimony during the trial and in his deposition show he made the transfer to carry out his longstanding intent to protect the residence from the claims of creditors, whenever such claims might arise. A transfer made in such circumstances is fraudulent. Were it not for the Davis case, this Court would be disinclined to deny discharge based on the prepetition transfer of a fully encumbered property. After all, logic suggests that the transfer of a property with no value reachable by creditors in no way hinders or delays those creditors. However, the Eleventh Circuit has rejected such reasoning in Davis. Because this Court is bound by Davis, the lack of equity in Debtor's residence cannot mitigate against the finding of fraudulent intent. Therefore, the Court concludes that AB&T has proven its case under § 727(a)(2)(A).

## Dissipation of Accounts Receivable

Under 11 U.S.C. § 727(a)(5), the debtor is not entitled to a discharge if he "has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" Denial of discharge under § 727(a)(5) must be proven in two stages. First, the creditor must demonstrate "that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors." Gonzalez v. Gonzalez (In re Gonzalez), 302 B.R.

15

745, 754-5 (Bankr. S.D. Fla. 2003) (citing In re Bryson, 187 B.R. 939, 955 (Bankr. N.D. Il.. 1995)). Next, the burden shifts to the debtor to explain his disposition of the assets. Id. A satisfactory explanation is one that "convince[s] the judge." Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir.1984) (citations omitted). No documentation is necessary if "the debtor's explanation is convincing and not rebutted[.]" D.A.N. Joint Venture v. Cacioli (In re Cacioli), 463 F.3d 229, 238 (2d Cir. 2006). However, "[v]ague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." 748 F.2d at 619.

In this case, both parties agree that Southland Technologies borrowed money from AB&T secured by a lien in all its property, including accounts receiveable. AB&T alleges that Technologies improperly transferred at least $640,000 to Enterprises, which in turn transferred at least $24,000 of that money to Controls. In addition, Enterprises paid Mr. Barfield $245,477 between January 2011 and June 2011. AB&T argues this flow of money represents proceeds from Technologies' accounts receiveable that were not made available to AB&T and are now unreachable by AB&T. However, AB&T has failed to show that the funds in question were ever assets of Debtor or that Technologies used the money for an improper purpose.

The money in dispute was the proceeds of Technologies' accounts receiveable. Debtor's sole ownership of Technologies is not sufficient to bring the money within the scope of § 727(a)(5). Stanley v. Paige (In re Paige), 335 B.R. 358, 361 (Bankr. N.D. Texas 2005). In Paige, the court found § 727(a)(5) did not apply to property owned by the debtor's professional association. Id. "Though [the debtor] owns and operates the professional association, the accounts receivable of the professional association would indeed belong to the entity rather than

16

[the debtor] individually." Id. Thus, the debtor was entitled to summary judgment on a § 727(a)(5) claim based on loss of the professional association's assets. Id.; see also Lort v. Ferguson Enter., Inc. (In re Lort), 347 B.R. 909, 910 (M.D. Fla. 2006) (for purposes of a discharge objection under § 727(a)(2), absent some basis for piercing the corporate veil, "[a] corporation's property is not property of its shareholders, even where, as here, the corporation has only one shareholder."). This Court agrees with Paige and Lort. Without proof that Debtor owned the assets in question, AB&T fails to make out a prima facie case under § 727(a)(5).

Furthermore, even if the Court found Debtor to be the *de facto* owner of the account receiveables, his explanation for the disposition of those receivables satisfies the Court. Debtor testified that each of the three Southland companies were fulfilling separate contracts in the first half of 2011. In doing so, one company sometimes used materials and labor owned by the other companies. The money transfers among the companies were made to account for such use. Thus, if Technologies used materials owned by Enterprises, Technologies paid Enterprises for those materials. Furthermore, both Debtor and Mr. Barfield testified that the money paid by Enterprises to Mr. Barfield in 2011 were repayments for advances made by Mr. Barfield. AB&T offered no evidence to refute this testimony, which the Court finds credible. The purchase of materials and payment of labor costs are legitimate uses of proceeds from accounts receivable. Because AB&T has failed to demonstrate the accounts receivable were ever property of Debtor or that they were dissipated without satisfactory explanation, it has failed to prove its case under § 727(a)(5).

## Conclusion

The Court finds the transfer of Debtor's one-half interest in the marital residence was made with intent to hinder, delay, or defraud creditors. Therefore, the Court will enter judgment

17

for AB&T and deny Debtor's discharge. An Order in accordance with this Opinion will be

entered on this date.

END OF DOCUMENT